## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| IBIN QADIR JACKSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 18-1978 (ABJ) |
| | ) | |
| DISTRICT HOSPITAL PARTNER, L.P. | ) | |
| *doing business as* | ) | |
| GEORGE WASHINGTON | ) | |
| UNIVERSITY HOSPITAL, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

On July 16, 2018, plaintiff Ibin Qadir Jackson brought this action in the Superior Court for

the District of Columbia against his former employer, defendant District Hospital Partner, LP,

d/b/a The George Washington University Hospital ("GWUH").[1]  Plaintiff alleged that he was

"wrongfully terminated for briefly (10 seconds) raising [his] voice in relation to being coerced and

forced to work on 1 of the only 2 official Holidays in the Mu[sl]im religion, Eid-al-fitr," and that

he "was refuse[d] [his] only religious accommodation request in [his] 3-year tenure."  Ex. A to

Notice of Removal [Dkt. # 1-2] ("Compl.") at 1.  Attached to his complaint was a U.S. Equal

Employment Opportunity Commission "Charge of Discrimination" that alleged that defendant

discriminated against him on the basis of sex, race, and religion, and retaliation in violation of the

Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e, *et seq.*  Ex. B to Notice of

---

[1]     Defendant removed the case to this Court on August 23, 2018.  Notice of Removal [Dkt. # 1] ("Def.'s Notice").  Plaintiff was proceeding pro se until September 17, 2019, *see* Min. Order (Sept. 17, 2019), and is now represented by counsel.  *See* Opp. to Def.'s Mot. for Summ. J. [Dkt. # 27] ("Pl.'s Opp.") at 6; *see also* Notice of Appearance [Dkt. # 18].

Removal [Dkt. # 1-3] ("Charge of Discrimination") at 1–2; *see* EEOC Notice of Charge of Discrimination, Ex. C. to Notice of Removal [Dkt. # 1-4] at 5–6 (signed and dated version).

On October 25, 2018, defendant moved to dismiss the complaint, arguing that because plaintiff failed to reference a "specific statute pursuant to which he is making his claim(s)," "defendant ha[d] insufficient notice." Def.'s Mot. to Dismiss Pl.'s Compl. [Dkt. # 8] at 5, 7. The Court found, granting all inferences in plaintiff's favor, that the pro se complaint stated claims for disparate treatment and retaliation under Title VII, and it allowed those claims to move forward. *See* Mem. Op. [Dkt. # 11]; *see also* Order [Dkt. # 10]. It noted at the time, though, that it would be incumbent upon the plaintiff to come forward with evidence to support his claims at the summary judgment stage. Mem. Op. at 9–10 (discrimination); Mem. Op. at 11 (retaliation).

The parties engaged in discovery, and defendant moved for summary judgment on September 28, 2021. Def.'s Mot. for Summ. J., Mem. of P. & A. in Supp. of Def.'s Mot. for Summ. J. [Dkt. # 26] ("Def.'s Mot.");  Errata [Dkt. # 29].[2]  The motion is fully briefed.[3]  Because plaintiff has failed to produce sufficient evidence to enable a reasonable juror to conclude that he was either discriminated against on the basis of his race, age, or religion or retaliated against because of his protected activity, the Court will **GRANT** the motion.

---

2    All citations to Def.'s Mot will be to the PDF page numbers.

3    *See* Pl.'s Opp.; Def.'s Reply to Pl.'s Opp. to Def.'s Mot for Summ. J. [Dkt. # 28] ("Def.'s Reply").

# BACKGROUND

Plaintiff, a Muslim, African-American male, was employed by GWUH from June 24, 2013 until July 18, 2016.[4]  Ex. 2 to Def.'s Mot., GWUH Employment Offer Letter [Dkt. # 26-2] ("Offer Letter"); Ex. 6 to Def.'s Mot., Employee Corrective Action Report (July 18, 2016) [Dkt. # 26-6] ("Final Corr. Act. Rep."); Charge of Discrimination at 1.  He was hired as a Patient Sitter, an at-will position, and he served in this role until his termination.  Def.'s SOF ¶¶ 4, 6; Pl.'s Resp. to Def's SOF ¶¶ 4, 6.  About a year into his employment with GWUH, he also began working for the hospital as a float technician.  Ex. 1 to Def.'s Mot., Dep. of Ibin Qadir Jackson (June 10, 2021) [Dkt. # 26-1] ("Pl.'s Dep.") at 56:11–15.[5]  Plaintiff reports that he had a "positive" relationship with his supervisors, including an individual named Rochelle Coles, who knew that he was Muslim.  Def.'s SOF ¶¶ 9–11; Pl.'s Resp. to Def's SOF ¶¶ 9–11; *see* Decl. of Rochelle Coles, RN, Ex. 8 to Def.'s Mot [Dkt. # 26-8] ("Coles Decl.") ¶ 3.

Plaintiff received three Employee Corrective Action Reports prior to the events that led to his termination.  The first, issued on November 10, 2014, was a "written warning" for failing to report to work during an on-call shift.  Ex. 3 to Def.'s Mot., Employee Corrective Action Report (Nov. 10, 2014) [Dkt. # 26-3]; *see* Def.'s SOF ¶ 12; Pl.'s Resp. to Def's SOF ¶ 12.  The second, issued on March 2, 2015, was for failing to report a patient fall in accordance with hospital protocol.  Ex. 4 to Def.'s Mot, Employee Corrective Action Report (Mar. 2, 2015) [Dkt. # 26-4];

---

4    Defendant submitted a statement of material facts – as to which it contends there is no genuine issue – in support of its motion for summary judgment.  *See* Def.'s Mot., Statement of Material Facts Not in Dispute ("Def.'s SOF") ¶¶ 1–19.  Plaintiff filed a response.  *See* Pl.'s Opp., Pl.'s Resp. to Def.'s Statement of Material Facts Not in Dispute ("Pl.'s Resp. to Def.'s SOF").

5    All citations to plaintiff's June 10, 2021 deposition will be to the original page numbers in the document, and not to the PDF page numbers.  Defendant submitted an excerpt of the same deposition as an exhibit to its reply.  *See* Dep. of Ibin Qadir Jackson, Ex. 1 to Def.'s Reply [Dkt. # 28-1] ("Pl.'s Dep. II").

*see* Def.'s SOF ¶ 13; Pl.'s Resp. to Def's SOF ¶ 13.   And the third, which was issued on

May 20, 2016, reported that plaintiff had been suspended from May 11, 2016 to May 20, 2016 for

leaving a patient with another patient sitter without notifying the nurse or the charge nurse.   Ex. 5

to Def.'s Mot., Employee Corrective Action Report (May 20, 2016) [Dkt. # 26-5]; *see* Def.'s

SOF ¶ 14; Pl.'s Resp. to Def.'s SOF ¶ 14.   After his third infraction, plaintiff received a "final

written warning" telling him that an additional workplace transgression could result in him losing

his job.  *See* Final Corr. Act. Rep. (in "History of Corrective Action," section, noting that plaintiff

had previously received a "Final Written Warning"); *see also* Pl.'s Dep. at 137:11–138:3 (plaintiff

avers he understood meaning of final written warning).   Plaintiff has not argued that any of these

reports were discriminatory or retaliatory, nor does he contend that he was ever treated negatively

at work based on his religion prior to his termination.   Def.'s SOF ¶¶ 15–16; Pl.'s Resp. to Def's

SOF ¶¶ 15–16.

The lawsuit relates to the events surrounding July 6, 2016.   Plaintiff typically scheduled

his work shifts himself by signing up through an electronic portal; the hospital then assigned

plaintiff to work either as a patient sitter or a float technician for that shift.   Def.'s SOF ¶¶ 7–8,

citing Pl.'s Dep. at 71:15–72:2; Pl.'s Resp. to Def.'s SOF ¶¶ 7–8.   Plaintiff scheduled himself for

a night shift on July 6, 2016 through this portal, and the shift was approved.   Pl.'s Dep. at 79:11–

80:6.   That day, plaintiff called his supervisor, Rochelle Coles, two times and asked to cancel the

shift so that he could celebrate the Muslim holiday of Eid-al-Fitr.   Pl.'s Dep. at 79:19–80:16,

84:20–21.   Plaintiff explains that he learned that morning that his friends and family would be

celebrating the holiday at the mosque and he wished to join them.   Pl.'s Dep. at 81:3–8, 82:15–18.

Plaintiff also testified, though, that if his friends had not called him, he might have asked to cancel

his shift anyway because he had been working long hours and was tired.   Pl.'s Dep. at 88:21–89:7.

4

He had not previously requested time off to celebrate religious holidays.  Pl.'s Dep. at 83:7–12.

At that point, plaintiff's supervisor responded that he would not be able to cancel his shift for that

night.  Pl.'s Dep. at 84:4–8; *see also* Pl.'s Dep. II at 84:4–86:13.  According to plaintiff, his calls

with Coles lasted approximately ten to fifteen seconds each.  Pl.'s Dep. II at 84:13–21, 86:11–13.

Coles did not explain the basis for her decision, and plaintiff did not ask for a reason.  Pl's Dep.

at 84:4–12.

When he reported for his shift in accordance with the supervisor's instructions, plaintiff

learned that he had been assigned to work as a patient sitter rather than a float technician, which

upset him.  Pl.'s Dep. at 94:2–8.  He went to the nursing administration office and complained to

the staffing specialist, an individual identified as Fassaka, that he had been assigned to work as a

sitter – a role "anyone" could do – instead of being permitted to cancel his shift to celebrate Eid.

Pl.'s Dep. at 95:7–96:9.[6]  He raised his voice, and Fassaka told him to calm down.  Pl.'s Dep.

at 96:10–17; 99:8–9.  The housing operations supervisor, Theresa Pulaski,[7] who was also present

in the nursing administration office, heard plaintiff's raised voice and called him into her office.

Pl.'s Dep. at 98:1–99:15.  Once there, plaintiff apologized for complaining and said he wanted

another assignment that day.  Pl.'s Dep. at 99:14–19.  Pulaski told plaintiff that because of his

"state of mind," it would be best if he went home.  Pl.'s Dep. at 110:17–111:4.  Plaintiff was then

suspended from July 6 until July 18, 2016, at which time Kevin Jackson, GWUH's Human

---

6       *See also* Charge of Discrimination at 1 ("I was now simply working as a 'sitter' in the
emergency room.  4S [the department plaintiff was originally assigned to work] normally has 30
patients with each technician working with 8-10 patients; it requires technical skill to work in this
department and having done it before, I was fine with working at 4S as I liked the challenging
environment.").

7       Defendant believes that plaintiff may have erroneously identified Therese Parillo, House
Operations Supervisor, as "Theresa Pulaski."  Def.'s SOF ¶ 21 n.3.

Resources Manager,[8] and Coles informed him that his employment would be terminated.  Pl.'s

Dep. at 112:11–21, 115:11–116:2.  They told plaintiff that because he had been "unprofessional

and disruptive," he had to be "let go."  Pl.'s Dep. at 116:1–2.  The Employee Corrective Action

Report documenting plaintiff's termination states that his behavior violated the hospital's

Employee Conduct and Work Rules Policy, in particular, Rules # 1 and 4.  Final Corr. Act. Report.

Those rules warn that corrective action may be imposed in the case of:

- "Verbal or physical abuse/threats, intimidating, swearing, disruptive, or coercing behavior directed toward (or in the presence of) a patient, visitor, or GWUH employee[,]" or

- "Any behavior which disrupts or interferes with patient care, another staff member's work performance, or creates a non-productive work environment."

The George Washington University Hospital Employee Handbook, Ex. 7 to [Dkt. # 26-7]

("Employee Handbook") at 26.[9]

Plaintiff alleges that GWUH discriminated against him on the basis of his religion by

refusing to accommodate his request to cancel his shift to celebrate Eid-al-Fitr and firing him for

complaining.  Pl.'s Resp. to Def.'s SOF ¶ 24; Pl.'s Aff. [Dkt. # 27] ¶ 5.  In his deposition, plaintiff

asserted that other employees had complained about their shift assignments in a similar "raised

voice manner" and were treated differently than he was, but he has not identified the other

employees.  Pl.'s Dep. at 113:20–115:3; Def's SOF ¶¶ 25–26; Def.'s SOF ¶¶ 25–26; Pl.'s Resp.

---

8       Although plaintiff said he thought the Human Resources Manager who made the decision to terminate him was named "Keith Jackson," it appears that this individual is named Kevin Jackson.  Kevin L. Jackson, in a signed and sworn declaration submitted to the Court, averred that he "was the HR representative who consulted with Rochelle Coles in the decision to terminate Ibin Qadir Jackson."  Decl. of Kevin. L. Jackson, Ex. 9 to Def.'s Mot. [Dkt. # 26-9] ("Kevin Jackson Decl.") ¶ 5.

9       All citations to the employee handbook will be to the original page numbers in the document, and not the PDF page numbers.

to Def.'s SOF ¶¶ 25–26.  Plaintiff has also alleged that his termination was retaliatory.  Charge of Discrimination at 1–2.

Plaintiff filed a Charge of Discrimination against GWUH with the EEOC, and defendant received a letter from the EEOC dated October 6, 2019 stating that plaintiff was alleging discrimination on the basis of religion, race, and sex, as well as retaliation.  EEOC Notice of Charge of Discrimination at 1.  Plaintiff's EEOC case was dismissed on April 18, 2018, and plaintiff filed this suit on July 16, 2018.  Ex. A to Notice of Removal, Complaint & EEOC Dismissal and Notice of Rights [Dkt. # 1-2].

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (internal quotation marks omitted).

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation.  *Id.* at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).  In assessing a party's motion, the court must "view the facts and draw reasonable

inferences 'in the light most favorable to the party opposing the summary judgment motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations omitted), quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

## ANALYSIS

Because there is no genuine issue of material fact in dispute in this case and plaintiff has not come forward with evidence that defendant's proffered nondiscriminatory reasons for the challenged actions were pretextual, defendant's motion for summary judgment will be **GRANTED**.

## I.    Disparate Treatment under Title VII

Title VII makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."   42 U.S.C. § 2000e-2(a)(1).   To state a prima facie case of disparate treatment under Title VII, a plaintiff must show two essential elements:  (1) that he suffered an adverse employment action (2) because of his race, color, religion, sex, or national origin.  *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008).

When a plaintiff brings a disparate treatment claim under the anti-discrimination provision of Title VII and relies on circumstantial evidence to establish the employer's unlawful conduct, as is the case here, *see* Def.'s SOF ¶ 17; Pl.'s Resp. to Def.'s SOF ¶ 17, the court applies the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Barnette v. Chertoff*, 453 F.3d 513, 515 (D.C. Cir. 2006).  Under that framework, the plaintiff bears the initial burden of establishing a prima facie case.  *McDonnell Douglas*, 411 U.S. at 802; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  Once a prima facie case is established,

"[t]he burden . . . must shift to the employer to articulate some legitimate, nondiscriminatory reason" for the adverse action. *McDonnell Douglas*, 411 U.S. at 802; *Holcomb*, 433 F.3d at 896. If a legitimate, nondiscriminatory reason is given, the burden shifts back to the plaintiff to prove that the proffered reason is a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804; *Holcomb*, 433 F.3d at 901.

Where, however, the defendant proffers a legitimate, non-discriminatory reason for the adverse action, the court need not conduct the threshold inquiry into whether the plaintiff established a prima face case of discrimination. *Brady*, 520 F.3d at 493–94 ("Lest there be any lingering uncertainty, we state the rule clearly:  In a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, nondiscriminatory reason for the decision, the district court need not—and should not—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*.").

A plaintiff can meet his burden to establish pretext by providing evidence from which a reasonable jury could find that the employer's proffered, lawful reasons for acting are "unworthy of credence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000).  Showing pretext, though, "requires more than simply criticizing the employer's decisionmaking process." *Hairston v. Vance-Cooks*, 773 F.3d 266, 272 (D.C. Cir. 2014).  It is not sufficient to "show that a reason given for a job action [was] not just, or fair, or sensible," nor is it sufficient to challenge "the correctness or desirability of [the] reasons offered." *Fischbach v. D.C. Dep't of Corrs.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (internal quotation marks omitted).  "If the employer's stated belief about the underlying facts is reasonable in light of the evidence, . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts." *Brady*, 520 F.3d at 495.

Plaintiff claimed at the outset of this case that he was suspended and then "wrongfully terminated" from his position because of his race, sex, and religion.  Compl. at 1; Charge of Discrimination at 1.  He also asserted that "other non-Muslim, non-Male, non-African American individuals have been treated better than [him], and were not terminated for 'raising their voice.'" Charge of Discrimination at 2.  Defendant's position is that plaintiff's "undisputed inappropriate behavior . . . served as the basis for Defendant's termination decision, and there is no evidence upon which to question the legitimacy of Defendant's decision."  Def.'s Reply at 2; *see* Def.'s SOF ¶ 24 ("Defendant terminated Plaintiff's employment for violation of its Employee Conduct and Work Rules Policy.").[10]

Defendant has offered legitimate, non-discriminatory reasons for its decision to suspend and then terminate plaintiff:  plaintiff violated GWUH's Employee Conduct and Work Rules Policy by raising his voice to complain about his assignment, and by that time, he had already received three Employee Corrective Action Reports along with a warning that another infraction could lead to his termination.  Def.'s SOF ¶¶ 12–14, 20, 24.[11]  And plaintiff has not come forward with any evidence that gives rise to a genuine dispute of fact with respect to defendant's account

---

[10]    It is not clear whether plaintiff also meant to allege that defendant's denial of his request to cancel his shift to celebrate Eid was also discriminatory.  *See* Compl. at 1 (plaintiff writes that he was "refuse[d] [his] only religious accommodation request in [his] 3 year tenure"); *see also* Pl.'s Aff. ¶ 5 ("They have granted numerous [religious accommodation requests] for Christians and Jews").  This allegation, if plaintiff indeed to make it, is undercut by the fact that plaintiff was the one who scheduled himself to work on the holiday, *see* Pl.'s Dep. at 79:11–80:6, and the shift had been approved and assigned by the hospital before plaintiff called that morning to request time off instead.  *See* Def.'s Mot. at 9–10; Pl.'s Dep. at 79:11–80:16.  Defendant denied this last-minute request, and plaintiff has not pointed to evidence that would create a genuine dispute of fact with respect to whether the denial was based on plaintiff's race, sex, age, or anything other than the timing of the request.

[11]    Plaintiff's third infraction, for which he received a "final written warning," occurred less than two months prior to the outburst leading to his termination.  *See* Ex. 5 to Def.'s Mot., Employee Corrective Action Report (May 20, 2016); Final Corr. Act. Rep. (issued July 18, 2016).

of the events.  Plaintiff admits that he raised his voice because he was upset about his work assignment, he was told to calm down, and he later apologized for complaining about where he was assigned.  Pl.'s Dep. at 99:8–9, 99:14–19.  The Employee Corrective Action Report documenting the incident tells a similar story:  "On July 6, 2016 at the beginning of the PM shift, Ibin came to the Nursing Administration office upset because he did not want to be assigned to be a sitter in the emergency room.  Ibin's behavior was unprofessional and disruptive."  Final Corr. Act. Rep. at 1.

The terms of the Employee Handbook are not in dispute either.  It advises that the "types of conduct that can result in corrective action up to and including immediate employment termination" include "intimidating" and "disruptive" behavior directed toward a hospital employee, and any other behavior that "disrupts or interferes" with the workplace.  Employee Handbook at 26.

Given this evidence, the burden shifts back to plaintiff to show that these reasons were a pretext for discrimination.  *See McDonnell Douglas*, 411 U.S. at 804.  And notwithstanding the Court's admonition that at this stage, plaintiff would need to come forward with evidence and could not rely on allegations alone,[12] plaintiff has failed to "designate specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324.

Plaintiff asserts that he was treated more harshly than comparators, but he has not yet identified any particular instance or person "who was treated differently than Plaintiff was treated

---

12      In its August 2019 Memorandum Opinion, the Court explained that to meet his burden, plaintiff could cite the defendant's "better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group" or other relevant evidence.  Mem. Op. at 10 n.1, quoting *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015).

as a result of being sent home due to a raised voice." Pl.'s Resp. to Def's SOF ¶ 26; Pl.'s Dep. at 113:20–115:3. He has not produced evidence that defendant's explanations for his suspension and termination were inconsistent or that defendant deviated from established procedures or criteria in taking these actions. *See generally* Pl.'s Opp. Nor has he pointed to a pattern of poor treatment of other employees in the same protected group; to the contrary, he avers that defendant has granted religious accommodations to at least one other Muslim employee, Pl.'s Dep. at 115:6–10, and he does not suggest that GWUH treated him negatively based on his religion at any time prior to his termination. Def.'s SOF ¶ 16; Pl.'s Resp. to Def's SOF ¶ 16.

Plaintiff offers several theories for why, in his view, a reasonable jury could find GWUH's stated reasons for his firing to be pretextual. First, he submits that defendant could have granted his request to cancel his shift on July 6, and its failure to do so demonstrates discriminatory animus. *See* Pl.'s Opp. at 3, 5; Pl.'s Aff. ¶ 5. Plaintiff does not point to evidence in the record in support of this contention, but he states that he "can testify that enough people were available to fill the crucial jobs [that day] as shown by his transfer to a less vital work assignment." Pl.'s Opp. at 3. He asserts that he was "ordinarily tasked with significant matters," but that on the day in question, he was given a "non crucial task that should not have been prioritized above a legitimate religious holiday." *Id.* at 5. He adds that GWUH's decision not to accommodate his request was "discriminatory" because plaintiff "had been historically willing to fill in and had made substantial and ongoing efforts to be a model employee." Pl.'s Resp. to Def.'s SOF ¶ 24. Finally, he argues that GWUH has "granted numerous requests [for religious accommodation] for Christians and Jews," although he does not elaborate any further. Pl.'s Aff. ¶ 5.

The arguments about what the hospital should have done on July 6 simply restate the initial allegations and do not create a question of material fact for a jury. Even if there were employees

available to fill in at the last minute, that evidence would not show that defendant's stated reason for the termination – the raised voice after three warnings for other infractions – was "phony."  *See Fischbach*, 86 F.3d at 1183.  Plaintiff may believe that he was justified in complaining and should not have been fired for doing so, and others might reasonably agree that the sanction was harsh given the reasons for plaintiff's disappointment and his prompt apology, but at bottom, plaintiff is challenging the wisdom of, or necessity for, the employer's decision.  Merely proposing that an adverse action was "not just, or fair, or sensible," is not sufficient to meet a plaintiff's burden under *McDonnell-Douglas* and to defeat a motion for summary judgment.  *Id.*  Moreover, plaintiff has not come forward with any evidence to support his allegation that "Christians and Jews" were "granted numerous requests" in similar circumstances.  *See* Pl.'s Aff. ¶ 5.

Plaintiff's effort to rely on his positive work history does not carry the day either.  He points to his "willingness to serve many roles and work extra hours" and his "positive relationship with his supervisors," and maintains that he was "hardworking, well liked and a valuable employee."  Pl.'s Opp. at 5.  He elaborates on these facts in his affidavit, attesting that he worked "64–80 hours a week even in a pandemic in a level one trauma hospital."  Pl.'s Aff. ¶ 5.  Plaintiff's characterization of his relationship with his supervisors may be somewhat undercut by the three Corrective Action Reports, but even assuming that the evidence of his dedication, work ethic, and positive working relationship with his supervisors is undisputed, it adds up to another attempt to question the merits of the employer's decision, as opposed to evidence of a discriminatory animus.

Finally, plaintiff seems to suggest that his previous infractions were minor in an attempt to show that defendant's reliance on them in its decision to terminate plaintiff was pretextual.  *See* Pl.'s Resp. to Def.'s SOF ¶¶ 12–14; Pl.'s Aff. ¶¶ 2–4.  With respect to his first Employee Corrective Action Report, which was issued for failing to report to the hospital when he was on call and asked

to report, plaintiff explains that he "could not go in because [he] was in charge of watching [his] minor niece." Pl.'s Aff. ¶ 2. He explains that his second Corrective Action Report was issued when he failed to file a required report immediately after finding a patient sitting on the floor; he feels this Corrective Action Report was "unfair" because he "did file the patient report within 24 hours" of the incident. Pl.'s Aff. ¶ 3. Finally, he explains that his third Corrective Action Report was for "[going] downstairs to get money for a friend while another friend who was also a patient sitter watched the patient" and that "[n]o harm came to the patient." Pl.'s Aff. ¶ 4.

Plaintiff has admitted that he engaged in the behavior for which he was sanctioned in each instance. He has not argued that any of the three previous Corrective Action Reports were discriminatory or retaliatory. He has not provided any evidence that other employees who engaged in similar behavior were treated differently. *See* Pl.'s Resp. to Def.'s SOF ¶¶ 12–15, 26. His belated attempt to excuse or minimize the prior incidents does not constitute evidence that the hospital was being disingenuous when it decided, consistent with its prior warning, that one more infraction was grounds for termination. Once again, the question before the Court is not whether defendant's reasons for terminating plaintiff's employment were sound, but whether there is any evidence that would allow a reasonable jury to conclude that defendant did not actually suspend or fire plaintiff for the reasons it identified.

Because plaintiff has not come forward with any evidence that would enable a reasonable juror to conclude that defendant's stated reasons for its actions against plaintiff were a pretext for unlawful discrimination on the basis of race, sex, or religion, defendant's motion for summary judgment on plaintiff's discrimination claim will be granted.

## II.     Retaliation Under Title VII

Plaintiff also complains that defendant retaliated against him for "exercising [his] religious rights for accommodation" when it assigned him to a less desirable staffing assignment after he requested the day off to celebrate Eid, and when it suspended and ultimately terminated him for complaining about the denial of his accommodation request and his staffing assignment.  Charge of Discrimination at 1–2.

Title VII makes it unlawful for an employer to "'discriminate against' an employee . . . because that individual 'opposed any practice' made unlawful by Title VII."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006), quoting 42 U.S.C. § 2000e-3(a).  A plaintiff must show that retaliation was a "but-for" cause of the alleged adverse employment action, rather than just a substantial or "motivating" factor in the employer's decision.  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).  "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Id.* at 360.

At the summary judgment stage, Title VII retaliation claims are also evaluated in accordance with the *McDonnell Douglas* burden-shifting framework that is used to evaluate claims of disparate treatment.  That is, a plaintiff must first establish a prima facie case of retaliation. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000); *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007).  Once the plaintiff has made that showing, the burden shifts to the defendant to produce a "legitimate" and "nondiscriminatory reason" for its actions.  *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).  If an employer supplies such a reason, then the "burden-shifting framework disappears," and the Court must ask "whether a reasonable jury could

infer . . . retaliation from all the evidence." *Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004).

To establish a prima facie case of retaliation, plaintiffs must present evidence that (1) they engaged in activity protected by Title VII; (2) the employer took an adverse employment action against them; and (3) the adverse action was causally related to the exercise of their rights. *Holcomb*, 433 F.3d at 901–02. An "adverse action" in the context of a retaliation claim is one that is "harmful to the point that [such action] could well dissuade a reasonable worker from making or supporting a charge of discrimination," *Burlington N.*, 548 U.S. at 57; *see Rochon v. Gonzales*, 438 F.3d 1211, 1220 (D.C. Cir. 2006), and it is highly dependent on the "particular circumstances" of plaintiff's employment. *Burlington N.*, 548 U.S. at 69; *see Chambers v. District of Columbia*, 35 F.4th 870, 877 (D.C. Cir. 2022), judgment entered, No. 19-7098, 2022 WL 2255692 (D.C. Cir. June 23, 2022). The D.C. Circuit has noted that an actionable event is one that would "affect the employee's 'position, grade level, salary, or promotion opportunities.'" *Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009), quoting *Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008); *see also Baloch*, 550 F.3d at 1197 ("[W]e have previously underscored our hesitancy to . . . second-guess[] employers' decisions about 'which of several qualified employees will work on a particular assignment.'"), citing *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1556 (D.C. Cir. 1997); *see Mungin*, 116 F.3d at 1556 ("[O]ther circuits have held that changes in assignments or work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour changes.").

If a plaintiff cannot make a showing of material adversity, the inquiry ends there. *Chambers v. District of Columbia*, 389 F. Supp. 3d 77, 92 (D.D.C. 2019), *aff'd Chambers v. District of Columbia*, 988 F.3d 497 (D.C. Cir. 2021) ("[A]t the summary judgment stage, [plaintiff]

must still, at a minimum, demonstrate that she suffered an adverse employment action."), citing *Brady*, 520 F.3d at 493.

On a motion for summary judgment with respect to an actionable event, if the employer can "articulate some legitimate, nondiscriminatory reason" for the employment decision at issue, *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981), the district court no longer needs to assess whether the plaintiff made out a prima facie claim. *See Jones*, 557 F.3d at 678, citing *Brady*, 520 F.3d at 494. Instead, the question before the court at that point would be whether plaintiff "produced evidence sufficient for a reasonable jury to find that the employer's stated reason was not the actual reason" for the adverse action, and that the employer actually retaliated against the plaintiff. *Brady*, 520 F.3d at 495. In answering this question, though, "[t]he strength of the plaintiff's prima facie case, especially the existence of a causal connection, can be a significant factor" in showing a material dispute regarding retaliation. *Holmes-Martin v. Sebelius*, 693 F. Supp. 2d 141, 152 (D.D.C. 2010), citing *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 n.4 (D.C. Cir. 1998).

### A.     Shift Assignment on July 6

According to the plaintiff, the first allegedly retaliatory action occurred when he was assigned to work as a patient sitter rather than a float technician after he requested to cancel his shift to celebrate Eid. *See* Charge of Discrimination at 2 ("When I arrived at work however, I was now told . . . that I would be working as a 'sitter' in the Emergency Department (ED) – which required me to simply observe the patients; I felt like this was further punishment and retaliation for my religious beliefs."). Defendant argues that it always had the discretion to assign plaintiff to any shift or unit, so this decision could not be the adverse action needed to support a claim of retaliation. *See* Def.'s Mot. at 8.

17

It is undisputed that plaintiff was hired to serve as a patient sitter, and that he was still serving in that role on July 6, 2016, even though by that time, he was serving as a float technician as well.  Def.'s SOF ¶¶ 4, 6; Pl.'s Resp. to Def's SOF ¶¶ 4, 6; Pl.'s Dep. at 56:11–15.  And plaintiff testified that typically, after he signed up for a work shift on the electronic portal, the hospital would then assign him to work either as a patient sitter or a float technician for that shift.  Def.'s SOF ¶¶ 7–8, citing Pl.'s Dep. at 71:15–72:2; Pl.'s Resp. to Def.'s SOF ¶¶ 7–8.  So even if plaintiff's general preference was to work in the technician position he deemed more significant, plaintiff has not demonstrated the existence of any "change" in his work duties, much less, an adverse one.[13] Moreover, he was only assigned to the shift he found less desirable for one day – after signing himself up to work through the online portal – and he was paid the same rate regardless.  Pl.'s Dep. at 57:11–17; 71:12–72:18.  Since assigning plaintiff to do one of his regular jobs was not a materially adverse action, plaintiff has not made out a prima facie case of retaliation on the basis of his assignment on July 6.

### B.    Suspension and Termination

Plaintiff also alleges, though, that his suspension and termination were retaliatory.  *See* Charge of Discrimination at 2; *see also* Pl.'s Aff. ¶ 5 ("I am a hard working African American man

---

[13]    Moreover, plaintiff has not shown there was in fact a change in his assignment that day, because he did not testify that he had been assigned to be a float technician before he made the call to his supervisor asking to cancel his shift; the first time he learned what he would be doing was when he showed up for duty.  Plaintiff testified that when he signed up for a shift through the electronic portal, the hospital would decide which role he would have "on that particular day." Pl.'s Dep. at 71:12–72:2.  He did not know what his role would be until he arrived at work that day, and that was true for July 6, 2016 as well.  Pl.'s Dep. at 72:3–15, 91:9–92:17.  This means that the only "change" that occurred on July 6, 2016 was the location of his assignment within the hospital:  he was originally told to report to the "4 South" unit, Pl.'s Dep. at 93:4–15, but after he arrived, he was "transferred to work as a sitter in the emergency room," which plaintiff characterizes as "the hardest department in the entire hospital."  Pl.'s Dep. at 94:2–5, 94:10–11. So there is no evidence in the record that he was supposed to be a float technician that day or that the original assignment was changed.

. . . fired for a shift off to worship God."). The Court has already determined that defendant offered

legitimate, non-discriminatory reasons for its decision to suspend and then terminate plaintiff, that

is, that plaintiff violated the hospital's rules of conduct by raising his voice to complain about his

assignment in the wake of three previous employment infractions and a clear warning. *See* Def.'s

SOF ¶¶ 12–14, 20, 24.

So here again, the burden shifts back to the plaintiff to prove that the employer's proffered

reason is a pretext for what was actually retaliation against the plaintiff for complaining that what

he characterizes as a request for a religious accommodation was denied, and/or complaining that

he was being discriminated against as a Muslim and African-American male. *See Jones*, 557 F.3d

at 677; *Brady*, 520 F.3d at 495. Putting aside the question of whether plaintiff's outburst in the

nursing administration office constitutes "protected activity" for purposes of Title VII,[14] plaintiff

has failed to meet his burden for the same reasons that doomed his discrimination claims: he has

---

[14]     Under the retaliation provisions of Title VII, it is an unlawful employment practice for an
employer to discriminate against an employee "because he has opposed any practice made an
unlawful employment practice . . . , or because he has made a charge, testified, assisted, or
participated in any manner in an investigation, proceeding, or hearing[.]" 42 U.S.C. § 2000e-3.
But it is not clear there is evidence that he in fact opposed an illegal employment practice or
decision that day, and plaintiff has not shown that he made a charge under the participation clause
either. "[N]o 'magic words' are required" to engage in protected activity, but "the [employee's]
complaint must in some way allege unlawful discrimination, not just frustrated ambition."
*Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006). "Not every complaint garners its
author protection under Title VII." *Id.* (noting that plaintiff's memorandum may not be protected
activity since it did not allege that "she was currently being discriminated against or that she was
being retaliated against for her previous lawsuit").

         Plaintiff testified that when he arrived in the "4 South" unit and received his assignment
on July 6, he went to the nursing administration office and complained loudly to Fassaka that,
"This isn't right, and I deserve to have a day off for my religion. 25 percent of the whole world's
population is having a day off and I can't. And for what? For this. Anybody can be sitting in the
emergency room. I work 80 hours a week." Pl.'s Dep. at 96:3–8; *see* Def.'s SOF ¶ 20; Pl.'s Resp.
to Def.'s SOF ¶ 20. Plaintiff, by his own account, was angry that he was performing what he
viewed to be less valuable work during the shift he had been unable to cancel, but he did not
attribute the nature of the unwanted assignment to his race, religion, or any other protected status.

not presented any evidence that would allow a reasonable jury to conclude that defendant's stated reasons for his termination were pretextual.

The termination decision was made by plaintiff's immediate supervisor, Rochelle Coles, and the hospital's Human Resources Manager, Kevin Jackson.  Pl.'s Dep. at 112:11–21, 115:11–116:2.  In her signed and sworn declaration, Coles averred that she "was not aware (and [is] not aware) of Mr. [Ibin Qadir] Jackson complaining about discrimination based on race, sex, or religion at any time during the events of July 6, 2016, or concerning the events of July 6, 2016, or at any time prior to his termination of employment on or about July 20, 2016."  Coles Decl. ¶ 7. And in his signed and sworn declaration, Kevin Jackson averred that "[t]o the best of my recollection, I was not aware (and I am not aware) of Mr. Jackson complaining about discrimination based on race, sex, or religion at any time while he was employed with the Hospital."  Kevin Jackson Decl. ¶ 7; *see* also Def.'s SOF ¶¶ 28–29, citing Coles Decl. and Kevin Jackson Decl.; Pl.'s Resp. to Def.'s SOF ¶¶ 28–29.  Most important, even in his own account, plaintiff does not describe a conversation in which he was objecting to unlawful treatment based upon his protected status; his testimony recounts a loud reaction to an undesired assignment.

Since plaintiff has not come forward with any evidence to dispute the decision makers' sworn statements or with any other evidence giving rise to a genuine dispute as to whether defendant's stated reasons for suspending and terminating plaintiff were legitimate, defendant's motion for summary judgment on plaintiff's retaliation claim will also be granted.

## CONCLUSION

For the reasons outlined above, defendant's motion for summary judgment will be **GRANTED** as to both claims.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  August 31, 2022